J2SHORTESS, Judge.
Charles Kimball (plaintiff) was driving on Dyer Road in East Baton Rouge Parish on September 12, 1987, at approximately 5:15 a.m. He encountered a patch of heavy fog and ran off the roadway, down an embankment, and into a ditch, and sustained personal injuries. Plaintiff sued the City and Parish of East Baton Rouge (defendant), claiming it failed to properly maintain the roadway and shoulder, failed to install warning signs, and failed to properly construct shoulders on the roadway. After a bench trial, the trial court found plaintiff was free from fault. Plaintiff was awarded $86,-287.11, which included special damages.[2] Defendant appealed, contending that the cause of the accident was plaintiffs driving, not the roadway or the signs and that the testimony regarding lack of signs was inconclusive. Defendant also contends the trial court erred by not attributing any fault to plaintiff.
A. Signs
Plaintiff presented uncontradicted expert testimony from Duaine T. Evans, a traffic engineer. Evans felt appropriate signing for the curve in question would include two signs: (1) a curve warning sign with an advisory speed limit of 35 miles per hour located before the curve, and (2) black chevron arrows on a yellow reflective sign located in the curve. The posted speed limit for the road is 55 miles per hour, and Evans stated 35 to 40 miles per hour would be appropriate for the curve.[3]
Joseph E. Hughes, an East Baton Rouge Parish deputy sheriff, responded to the accident. He testified the posted speed limit for the entire road is 55 miles per hour. He did Jj¡not recall any road signs and did not mark any signs on his report. However, he stated he generally indicates only three types of signs on a report: stop signs, signs indicating intersections with stop signs, and speed limit signs. He also notes if signs have been knocked down in the accident. He stated he generally marks the speed limit for the whole road and would not note a 35-mile-per-hour advisory speed limit on a curve warning sign.
Plaintiff said he was not aware he was near the curve because no signs warned him. He testified the curve warning sign was not in place at the time of the accident because he did not see it. He testified he “would have seen it because it was clear there.”
Marlin M. Kimball, plaintiffs son, went to the accident site about 6:45 a.m. the day of the accident. He said it was daylight and the fog was burning off. He testified Dyer Road is only four to four and one-half miles long. He walked down the road approximately 200 feet before and 150 feet past the accident site to look for signs but did not locate any.
Sue Kimball, plaintiffs wife, testified she went back to the accident site that evening to look for her husband’s watch and glasses. She testified she did not see any signs, but she could not say specifically where she looked and acknowledged she was looking for glasses and a watch, not signs.
Plaintiffs photographs, taken one month following the accident, indicate several downed chevron signs, but they do not show a curve warning sign with an advisory speed limit of 35 miles per hour. Plaintiff could not state where these photos were taken in relation to the curve. Defendant’s maintenance records showed no maintenance work on the signs and no other work on the road after April 1987.
A Department of Public Works diagram of Dyer Road at the Comite Bridge shows curve advisory and chevron signs, but defendant presented no direct evidence to show they were in Aplace at the time of the accident. Defendant’s photo of the road, taken eight months after the accident, shows a curve advisory sign with a 35-mile-per-hour speed advisory approximately 1,000 feet ahead of the curve. Defendant contends plaintiffs ev- *685 idenee that signs were not up at the time of the accident was inconclusive.
B. The Shoulder
The shoulder of the road is approximately two feet wide and grassy. Evans testified a two-foot shoulder is inadequate by state and federal standards. The minimum acceptable shoulder width for the lowest class road is four feet. Because the curve is on a six-to-eight foot embankment, this shoulder creates a “non-recoverable slope.” This means a vehicle cannot recover if it goes off the road onto the shoulder because gravity is too great. Evans did not believe plaintiff had a “meaningful chance” to recover control of his vehicle at 45 miles per hour because of the characteristics of the slope.
However, Evans also stated if plaintiff had encountered this problem within 25 to 30 feet of the curve, he would not have had time to react. He also stated if the fog was as heavy as plaintiff stated, the inadequate shoulder would not have mattered.
Plaintiff testified he “hit the fog and it blindfolded me. I felt my wheel drop off the shoulder. And then I tried to pull it back and I lost control.” He testified only a few seconds elapsed between hitting the fog and going into the ditch. He testified he traveled approximately 25 to 30 feet before going down the embankment. He also testified he was going 45, or maybe 50, miles per hour at the time he hit the patch of fog and the accident occurred.
Hughes did not observe any skid marks, and his understanding of the accident was that “the vehicle ... encountered the curve and simply went over the edge.” A photo ls(plaintiffs) of the accident scene shows tracks going directly off the roadway down the embankment.
C. The Fog
The statement Hughes obtained from plaintiff “was that it was foggy that morning and that he couldn’t see. He couldn’t see the roadway.”
Plaintiff testified he drove through several other patches of fog but they were not as thick as the fog he encountered at the site of the accident. In approaching this patch of fog, he said he did not think it would be any thicker than the fog he encountered previously. However, when he went into this patch, “it blindfolded me.”
Plaintiff stated this route was not the usual route he took to work, but he had driven it two or three times and knew he would encounter a curve. He stated, however, “I didn’t know I was that close on the curve when I hit the fog.... I was coming to the curve. I didn’t realize I was already in the curve.” He knew, however, the curve “was somewhere along in that line of the road....”
D.Analysis
The standard of appellate review of factual findings is a two-part test: 1) the appellate court must find from the record there is a reasonable factual basis for the finding of the trial court, and 2) the appellate court must further determine the record establishes the finding is not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Factual findings should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial court’s or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106,1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or ^clearly wrong. Stobart v. State, 617 So.2d 880, 883 (La.1993); Housley v. Cerise, 579 So.2d 973, 976 (La.1991).
A cause-in-fact determination is one of fact on which appellate courts must accord great deference to the trial court. Cay v. State, 93-0887 (La. 1/14/94), 631 So.2d 393, 398; Spiller v. State, 95-1282, p. 8 (La.App. 1st Cir. 2/23/96), 668 So.2d 1318, 1323. Thifactual finding may be reversed only if the trial court is manifestly erroneous. Theriot v. Lasseigne, 93-2661, p. 5 (La. 7/5/94), 640 So.2d 1305,1310.
Reasonable evaluations of credibility and inferences of fact should not be dis *686 turbed, even though the appellate court may-feel its own evaluations and inferences are as reasonable. The court of appeal may not reverse even though it would have weighed the evidence differently. In applying the manifestly erroneous/clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. Rosell v. ESCO, 549 So.2d at 844.
The trial court in written reasons found plaintiff was operating his vehicle in a safe and prudent manner at a lawful rate of speed, but “[d]ue to impaired vision from a heavy and unexpected fog bank, [plaintiff] did not observe a sharp left-hand curve in the roadway which was preceded by no visible warning signs.” The court found “the combined failure by [defendant] to advise of this oncoming curve and to provide a safe shoulder constitutes a defect in design and construction of [t]his curve.” The court further stated had defendant placed adequate warnings before the curve plaintiff “would have been prepared to safely negotiate it” and had the shoulder been adequate, plaintiff “would have been able to regain control of his vehicle and return safely to the roadway.”
|7The evidence regarding the lack of signs was not strong. Although plaintiffs son and wife testified they went to the scene, viewed the general vicinity, and saw no signs, neither looked where the defendant’s photo indicates the sign is placed — 1,000 feet ahead of the curve. The only person who testified no sign existed in this area was plaintiff, who stated if the sign had been there, he would have seen it. That plaintiff did not see the sign does not necessarily establish the sign was not in place. Nevertheless, the trial court found plaintiffs testimony credible.
The only evidence to contradict plaintiffs statement was a photo, which defendant admitted was taken May 11,1988, eight months after the accident.[4] In light of this court’s mandate to defer to credibility determinations and factual findings of the trier of fact, we cannot say the trial court’s view that the sign was not in place and that this was a cause-in-fact of the accident was impermissible.
E. Apportionment of Fault
The apportionment of fault also is a factual finding which will not be disturbed on appeal unless it is clearly wrong. Cornish v. State, 93-0194, pp. 13-14 (La.App. 1st Cir. 12/1/94), 647 So.2d 1170, 1182, writs denied, 95-0547 (La. 5/5/95), 654 So.2d 324. In apportioning fault, the court should consider the conduct of each party at fault and the extent of the causal relation between the conduct and the damages. Watson v. State Farm, Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). In Watson, the supreme court set forth five factors which may influence the degree of fault assigned: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) hów great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or | ginferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Although the trial court did not specifically allocate percentages of fault, it found plaintiff was not at fault. Therefore, it allocated 100% fault to defendant. In light of the law and evidence, this finding was an impermissible view of the evidence and thus, clearly wrong.
A driver does not have the right to assume his course of travel is free from danger if he cannot see clearly ahead. If he continues to travel as if he knew there was perfect clearance, he does so at his own risk and peril. Sharpley v. City of Baton Rouge, 95-0574, p. 5 (La.App. 1st Cir. 11/9/95), 665 So.2d 21, 23; Hernandez v. State Farm Mut. Auto Ins. Co., 192 So.2d 679, 682-683 (La. App. 3d Cir.1966), writ not considered, 250 La. 103,194 So.2d 99 (1967).
Furthermore, a motorist is held to a higher degree of care in adverse condi *687 tions, and his duty to keep his vehicle under control increases in periods of low visibility. Sharpley, 95-0574 at pp. 4 — 5, 665 So.2d at 23; Crockett v. United States Fid & Guar. Co., 229 So.2d 169, 173 (La.App. 1st Cir.1969), writ denied 255 La. 286, 230 So.2d 589 (La. 1970). If conditions warrant it, a motorist may be required to stop his car and remain at a standstill until conditions warrant going forward. Hernandez, 192 So.2d at 682; Sharpley, 95-0574 at pp. 4, 665 So.2d at 23.
Plaintiff had traveled this road before, knew he would encounter this curve, and knew he had not yet negotiated it. The road is less than five miles long. He encountered a patch of fog on the road two miles before the curve, so he was aware of this weather condition. He testified he underestimated the thickness of this patch of fog because the prior patch was not as thick. Plaintiff did not have a right to assume he could safely enter another patch of fog traveling 45 to 50 miles per hour. Regardless of whether he saw a sign indicating the 19curve, his testimony shows he saw the upcoming patch of fog. Just seeing the fog was enough to require him, at a minimum, to slow down to whatever speed was necessary to determine how dangerous the fog was before proceeding into it. Had he done so, he may have completely averted the accident regardless of whether he had been warned of the curve.
The trial court found plaintiff “would have been prepared to safely negotiate” the curve if adequate signs had warned him of it and “would have been able to regain control” if an adequate shoulder had been provided. Nothing in the record supports these findings. Plaintiff testified he would have slowed down if he had seen a sign warning of the curve. Evans testified plaintiff probably would have slowed down if he had been warned of the curve. However, given the adverse weather conditions, plaintiff should have slowed his speed even if he had no warning of the impending curve. Furthermore, nothing indicated plaintiff would have successfully negotiated the curve given the circumstances of the blinding fog.
The trial court committed manifest error by not allocating any fault to plaintiff. Applying the Watson factors to the record before us, we find the plaintiff was aware of the danger and at a minimum underestimated, if not disregarded, the risk created by entering a patch of fog traveling at 45 to 50 miles per hour without knowing how thick it was. Patchy fog always presents a risk of disguised danger. As the driver, plaintiff was in the superior position to avert the harm caused by the fog. Nothing prevented plaintiff from slowing down before entering the fog, regardless of the lack of warning of the curve.
Under these circumstances, we are charged with establishing the highest amount of fault for which defendant may be charged and the lowest amount of fault for which the plaintiff may be charged. Clement v. Frey, 95-1119, pp. 9-10 | 10(La. 1/16/96), 666 So.2d 607, 611. Accordingly, we find defendant was 70% at fault and plaintiff was 30% at fault.
For the foregoing reasons, the judgment of the trial court is affirmed in part and amended in part, reducing plaintiffs principal award to $60,400.98. Costs of this appeal are assessed in accordance with the allocation of fault. Thus, defendant is cast for costs in the sum of $1,132.45, 70% of $1,617.79.
AFFIRMED IN PART, AMENDED IN PART, AND, AS AMENDED, AFFIRMED.

. Plaintiff's specials were $18,261.72 for medical bills and $18,025.89 for lost wages, totaling $36,-287.61.

. Evans did not give an opinion regarding the appropriate distance before the curve for a warning sign with the advisory speed limit.

. Defense counsel inadvertently indicated it was taken six months after the accident but stated the date was May 11, 1988.