965 So.2d 466 (2007)
Dr. Virendra CHARAN and Bindu Charan, Individually and on Behalf of Deependra Charan, and Anuradha Charan Saxena
v.
James L. BOWMAN, Paul Bowman, Allstate Insurance Company, Omni Insurance Company and State of Louisiana, Through the Department of Transportation and Development.
No. 2006 CA 0882.
Court of Appeal of Louisiana, First Circuit.
August 1, 2007.
*468 Daniel C. Vidrine, Todd C. Comeaux, Baton Rouge, Counsel for Plaintiffs/Appellees Virendra Charan and Bindu Charan, individually and on behalf of Deependra Charan and Anuradha Charan Saxena.
Charles C. Foti, Jr., Attorney General, Thomas D. Fazio, Special Assistant Attorney General, Baton Rouge, Counsel for Defendant/Appellant Louisiana Department of Transportation and Development.
Before: PARRO, GUIDRY, GAIDRY, McDONALD, and McCLENDON, JJ.
McCLENDON, J.
The State of Louisiana, through the Department of Transportation and Development (DOTD), appeals a judgment holding it partially liable for an automobile accident that occurred on a bridge in its care, custody, and control during adverse weather conditions. After a thorough review of the record, we reverse.

FACTS AND PROCEDURAL HISTORY
Early on the foggy morning of January 31, 1997, a life-threatening car accident occurred on the Louisiana Highway 1 bridge spanning the Morganza Floodway (the Morganza Floodway Bridge). The driver of a 1995 Ford Ranger pick up truck attempted to pass an eighteen-wheeler on the two-lane bridge and collided head on with a 1988 Volkswagen Fox driven by Deependra Charan. As a result of the accident, the driver of the pick up truck, James L. Bowman, sustained relatively minor injuries. Deependra, however, *469 sustained a traumatic brain injury leaving him in a chronic vegetative state since the accident. Following the accident, Bowman was cited for improper passing, driving under a suspended license, driving while intoxicated (DWI) third offense, and later arrested. He pled guilty to third offense DWI and first degree negligent injuring and was sentenced to five years incarceration for each offense to be served concurrently.
Dr. Virendra Charan and Bindu Charan, the parents of Deependra, filed a petition for damages, individually and on behalf of Deependra, against various defendants, including DOTD. In the petition, the plaintiffs alleged that DOTD was liable based on its alleged negligence in defectively designing and constructing the bridge and in failing to reduce the speed limit and designate the bridge as a no-passing zone. Following a four-day trial, the jury rendered a verdict in favor of the plaintiffs, assessing DOTD with thirty percent fault in causing the accident and awarding the plaintiffs $21,350,000.00 in general and special damages. The damage award was reduced to $21,060,932.15, pursuant to an unopposed motion for remittitur pertaining to the amount awarded for past medical expenses.

ASSIGNMENTS OF ERROR
In this appeal, DOTD contends that it was erroneously cast in judgment based on the following specifications of error committed by the jury:
1. The jury erred in finding that the . . . bridge had a defect that created an unreasonable risk of harm on January 31, 1997.
2. Alternatively, the jury erred in finding that the alleged defect which allegedly created an unreasonable risk of harm on January 31, 1997 was a cause-in-fact of the accident, including, specifically, whether DOTD had a duty to protect this plaintiff against this risk arising in the manner in which this accident occurred.
3. Alternatively, the jury erred in finding that DOTD had actual or constructive notice of the alleged defect in the bridge [,] which allegedly created an unreasonable risk of harm and had a reasonable time to correct the defect but failed to do so.
4. The jury erred in its apportionment of fault between James L. Bowman, Jr. and DOTD and, specifically, erred in not finding Bowman to be 100% at fault in causing this accident.
In answer to the appeal, the plaintiffs primarily ask that the judgment be modified in part to increase the percentage of fault assessed against DOTD to eighty percent.[1]

DISCUSSION
In order to find DOTD liable based on the design, construction, or condition of a state roadway, a plaintiff must prove that (1) DOTD had custody of the thing which caused plaintiffs' damages, (2) the thing was defective because it had a condition which created an unreasonable risk of harm, (3) DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) the defect was a cause-in-fact of plaintiffs' injuries. Cormier v. Comeaux, 98-2378, pp. 5-6 (La.7/7/99), 748 *470 So.2d 1123, 1127; see LSA-C.C. arts. 2317, 2317.1; LSA-R.S. 9:2800.
The parties stipulated at trial that DOTD had the care, custody, and control of the deck and railings of the Morganza Floodway Bridge and that it regulates the traffic flow on the deck of the bridge, including the signage and the determination of speed. In its first assignment of error, DOTD challenges the finding by the jury that the bridge had a defect that created an unreasonable risk of harm.
In deciding whether a site presents an unreasonably dangerous condition, the court must weigh the magnitude and probability of injury against the burden of preventing the injury. Woods v. State, Department of Transportation and Development, 37,185, p. 18 (La.App. 2 Cir. 8/14/03), 852 So.2d 1109, 1121, writ denied, 03-2584 (La.11/26/03), 860 So.2d 1140. Whether an unreasonably dangerous defect caused the plaintiffs' damages is a finding of fact and an appellate court may not overturn a jury's finding of fact in absence of manifest error or unless clearly wrong. Shilling ex rel. Shilling v. State, Department of Transportation and Development, 05-0172, p. 7 (La.App. 1 Cir. 12/22/05), 928 So.2d 95, 100, writ denied, 06-0151 (La.4/24/06), 926 So.2d 541.
The Morganza Floodway Bridge was constructed as a result of the passage of several public acts wherein the United States Congress authorized the U.S. Army Corps of Engineers to enter into an agreement with the State of Louisiana for the construction of the Morganza Floodway to control flooding caused by the Mississippi River and its tributaries. The floodway would extend from the Mississippi River north of Morganza, Louisiana, to the Atchafalaya River backwater in the vicinity of Batchelor, Louisiana.
Pursuant to that authorization, the Louisiana Highway Commission, a predecessor of DOTD, entered into Contract No. W1096eng-7114 on August 7, 1940, which provided "that a high level crossing providing facilities equal to those in [the] existing State Route No. 30 [Louisiana Highway 30][2] be constructed to carry the said existing State Route No. 30 over the said Morganza Floodway and its levees, at the expense of the United States of America." The then existing Louisiana Highway 30 traversed the area designated for the floodway at ground level.
The 1940 contract was later modified by a supplemental agreement dated October 1, 1948, in which it was acknowledged that the original contract "has been delayed due to war conditions and has yet to be commenced." According to the supplemental agreement, the parties found it advisable to combine the floodway control structure with the proposed high-level paved crossing of Louisiana Highway 30 over the designated floodway, observing that the funds then allotted were insufficient to complete the work and that the "aforesaid combination of structures will result in decreased total cost to the Government." Thus, the United States government funded the construction of the combined structure that resulted in the bridge, and in exchange for that funding, DOTD, through its predecessor, the Department of Highways, agreed to "accept, maintain, and operate the completed highway crossing over the Morganza floodway." The design and construction dates for the bridge can be gleaned from a set of construction plans dated 1948 submitted by the plaintiffs and an exhibit submitted by DOTD on which it is stated "[w]ork *471 under this project determined to be complete as of 30 June 1956."
Through the testimony of James R. Clary, Sr., a civil engineer qualified as an expert in traffic engineering and highway safety, including the sub-specialties of signing, construction, design and maintenance, the plaintiffs presented evidence seeking to establish that the Morganza Floodway Bridge, as constructed, contained a defect that created an unreasonable risk of harm. Clary stated that the bridge was defective because it was not constructed in conformity with standards applicable at the time. Clary explained that based on Louisiana Highway 1's classification as a "Class A" bridgeway in LSA-R.S. 48:191, which is the highest classification given to a roadway in the statute, DOTD was required to construct the bridge to the equivalent class of roadway in applicable engineering standards.
According to Clary, the "State of Louisiana Department of Highways 1948 Road Design Standards and Miscellaneous Data" (1948 Design Standards) generally provided the standards engineers would follow to design and build roadways at the time the bridge was designed and constructed. The 1948 Design Standards classified Louisiana roadways into six numerically designated classes (Class I through VI), with Class I being the highest class in the state. Equating a statutory "Class A" roadway to either a "Class I" or "Class II" roadway under the 1948 Design Standards, Clary stated that the bridge was defective because the 1948 Design Standards required, at a minimum, that the bridge consist of four, 12-foot wide traffic lanes, with 10-foot wide shoulders and a 40-foot median separating the four traffic lanes into two lanes traveling in one direction and two lanes traveling in the opposite direction. Instead, the existing structure consists of two traffic lanes  one lane measuring 11 feet, 3.5 inches wide and the other measuring 11 feet, 1.5 inches wide  with no median separating the lanes for traffic traveling in opposite directions.
In reviewing the evidence presented at trial, we agree with Clary's opinion that the bridge was not constructed in accordance with the specifications applicable to a Class I or II roadway under the 1948 Design Standards; but Clary was in error in his contention that, by law, DOTD was required to construct the bridge to those levels of classification. The statutory classification of Louisiana Highway 1 as a "Class A" highway did not occur until 1955, at the earliest.
The legislative history of LSA-R.S. 48:191 reveals that the statute was amended and re-enacted in 1955 to create and establish a system of state highways consisting of three classifications: "Class A Highways or a Primary System to include 4200 miles; Class B Highways or a Secondary System to include 4300 miles; and Class C Highways or a Farm-to-Market System to include 6750 miles." Among those classes, Louisiana Highway 1 "from a junction with La-US 190 at or near Erwinville through New Roads, Simmesport and Marksville to a junction with La.-US 71 at or near Alexandria" was listed among the highways in "Class A."[3] Prior to this re-enactment, LSA-R.S. 48:191 simply declared in what manner highways would be deemed included in the state highway system. See LSA-R.S. 48:191 (1950).
Clary also insisted that the bridge should have been built in conformity with a *472 Class I or Class II structure based on his analysis of the traffic counts for the roadway. However, he acknowledged at trial that he could not assess the classification of the roadway based on the traffic counts for 1948 or 1949 "because the road wasn't built" and no evidence was introduced to show the traffic count for the then existing Louisiana Highway 30. Nevertheless, referring to the anticipated future traffic counts for a Class III roadway as listed in the 1948 Design Standards, Clary declared that the Morganza Floodway Bridge was defective because the 1997 traffic count for the bridge exceeded the projected traffic count for a Class III bridge. According to the 1948 Design Standards, the anticipated future traffic count for a Class III bridge was 1,000 to 3,000 vehicles, but the 1997 annual average daily traffic count for the Morganza Floodway Bridge was 5,100.
Despite his reliance on 1997 figures, Clary admitted that the 1948 anticipated count was based on a 20-year projection. There was no evidence presented to show the traffic count of the roadway that existed in the location prior to the construction of the bridge or the actual annual average daily traffic count for the bridge exactly 20 years after its design and construction. Therefore, we find that Clary's opinion that the bridge should have been built to Class I or II roadway specifications based on the traffic count was not substantiated by the documentary evidence of record.
As observed by this court in Robin v. Mississippi Fast Freight Company, Inc., 97-2556, p. 6 (La.App. 1 Cir. 12/28/98), 744 So.2d 42, 46, writ denied, 99-0688 (La.4/30/99), 741 So.2d 16:
If expert testimony given in response to hypothetical questions is predicated on a statement of unproven facts, it has no probative value and should not affect the outcome of the case. Ultimately, the weight to be given expert testimony is dependent on the facts on which it is based, as well as the professional qualifications and experience of the expert. For an expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record. If the opinion is based on facts not supported by the record, the opinion may be rejected. (Citations omitted).
Hence, to the extent that Clary's testimony regarding the bridge was premised on the roadway's classification under LSA-R.S. 48:191 or traffic counts, we find the totality of the evidence, particularly the documentary evidence, did not establish that the bridge should have been designed and built to the specifications of a Class I or II roadway. As such, Clary's testimony was insufficient to prove that the bridge was defective on that basis.
Clary also opined that the bridge was defective because of DOTD's failure to construct the bridge in conformity with the specifications outlined in the supplemental agreement with the federal government. Clary testified that it was his belief that the supplemental agreement required the bridge "to have been designed and built similar to the [U.S. 190 bridge in Lottie]." The Lottie Bridge is a four-lane bridge with a median separating two lanes traveling in one direction from two additional lanes traveling in the opposite direction. The Lottie Bridge was built during the same time period as the bridge at issue in this appeal.
Article 2(a) of the supplemental agreement states that "[s]aid structure shall generally conform to the applicable portions of the designs employed for U.S. Highway No. 190 . . . and shall conform to the applicable portions of the American Association of State Highway Officials' `Standard Specifications for Highway Bridges"; however, immediately preceding that provision, the contract also stipulates *473 that "the Government shall cause a control structure . . . to be constructed. . . . Said structure shall afford accommodations for a single track railroad and a two-lane highway as shown on the General Plan entitled "Morganza Floodway, High Level Crossings for Louisiana Highway Route No. 30 and The Texas and Pacific Railway (Port Allen branch line) . . . which is attached hereto and made a part hereof." (Emphasis added.) Hence, contrary to Clary's assertion at trial, the reference to constructing the bridge to "generally conform" to the design of the Lottie Bridge did not mandate that the bridge be designed and built as a four-lane structure. Thus, the evidence does not substantiate or provide a reasonable basis for Clary's assertion that the bridge was defective on this basis.
Plaintiffs' expert also asserted at trial that the bridge was defective because it was too narrow. In addition, DOTD should have designated and posted it as a no-passing zone with a lower speed. Plaintiffs argued that the absence of the proper signage in foggy weather rendered the roadway of the bridge defective and caused the accident.
DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. Jacques v. State, Department of Transportation and Development, 2003-2226, p. 9 (La.App. 1 Cir. 9/17/04), 905 So.2d 294, 299, writ denied, XXXX-XXXX (La.2/18/05), 896 So.2d 36. It has also been held that DOTD's statutory duty to keep the state's highways in a reasonably safe condition includes a duty to maintain appropriate signs and traffic signals along the roadway. Lee v. State, Department of Transportation and Development, 97-0350, p. 4 (La.10/21/97), 701 So.2d 676, 678. However, the duty owed by DOTD does not include the obligation to protect a plaintiff against harm that would not have occurred but for the grossly negligent operation of a motor vehicle. Jacques, 2003-2226 at p. 9, 905 So.2d at 299. DOTD is not a guarantor of the safety of all travelers and cannot be held responsible for all injuries resulting from any risk. DOTD is liable only for those damages caused by a defective or unreasonably dangerous roadway of which DOTD had actual or constructive knowledge. Lee, 97-0350 at pp. 3-4, 701 So.2d at 677-78. While design standards may be relevant factors in deciding whether a roadway presents an unreasonable risk of harm, standards alone are not determinative. Boland v. West Feliciana Parish Police Jury, XXXX-XXXX, pp. 11-12 (La.App. 1 Cir. 6/25/04), 878 So.2d 808, 817, writ denied, 2004-2286 (La.11/24/04), 888 So.2d 231.
It is a plaintiff's burden to prove causation and that DOTD had actual or constructive notice of the hazardous condition of its highway and failed to take corrective action within a reasonable time. Lewis v. State, Department of Transportation and Development, 94-2370, p. 3 (La.4/21/95), 654 So.2d 311, 313. One is presumed to have constructive notice of a defect or dangerous condition when it is shown to have existed for such a long period of time that knowledge thereof can be presumed, or that it can be said that one should have had knowledge of the condition. Gayle v. Department of Highways, 205 So.2d 775, 780-81 (La.App. 1 Cir.1967), writs refused, 251 La. 932 and 933, 207 So.2d 538 and 539 (1968), application not considered, 251 La. 934, 207 So.2d 539 (1968). The jury's finding on this element is subject to the manifest error standard of review on appeal. See Lewis, 94-2370 at pp. 4-6, 654 So.2d at 314-315.
The law places a duty on a motorist to ascertain whether the "left side *474 is clearly visible and is free of oncoming traffic," before the motorist attempts to pass using the left lane. LSA-R.S. 32:75. A driver does not have the right to assume the course of travel is free from danger if he cannot see clearly ahead. If he continues to travel as if he knew there was perfect clearance, he does so at his own risk and peril. Kimble v. East Baton Rouge Parish, 95-1973, p. 8 (La.App. 1 Cir. 5/10/96), 673 So.2d 682, 686. Further, a motorist is held to a higher degree of care in adverse conditions, and his duty to keep his vehicle under control increases in periods of low visibility. Kimble, 95-1973 at p. 8, 673 So.2d at 686-87; Crockett v. United States Fidelity & Guaranty Company, 229 So.2d 169, 173 (La.App. 1 Cir.1969), writ refused, 255 La. 286, 230 So.2d 589 (1970); O'Rourke v. McConaughey, 157 So. 598 (La.App. Orleans Cir.1934). Adverse driving conditions call for unusual caution on the part of motorists. King v. King, 253 La. 270, 280, 217 So.2d 395, 398 (1968). If conditions warrant it, the motorist may be required to slow or pull over and stop until the visibility improves. See Kimble, 95-1973 at p. 8, 673 So.2d at 687. If the adverse condition or defect is open and obvious, defendants may have no duty to protect or warn against the hazard and the condition may not be unreasonably dangerous. Boland, XXXX-XXXX at p. 12, 878 So.2d at 818.
In Clary's opinion, the bridge was a narrow one because its width was less than the minimum specified in the "Standard Specification for Highway Bridges" published by the American Association of State Highway Officials (AASHO) in 1949 and 1953. Clary testified that, at the time the bridge was designed and constructed, AASHO outlined the national specifications for the construction of highway bridges. He explained that the AASHO publications did not classify highways; instead, they provided the information needed to design a bridge once an entity, in this case the state, determined the number of lanes and the traffic volume for the structure.
He testified that in both the 1949 and 1953 editions, AASHO required that the clear roadway of a single bridge must measure at least 26 feet wide, whereas the clear roadway of the bridge in question only measures 25 feet, 10 inches wide. Clary thus opined that "any bridge that is below the very minimum required by the standards at the time it was built which this is one of  is narrower than the minimum. It is a narrow bridge anyway you look at it."
On cross examination, Clary admitted that he did not measure to the curb and that he only measured at one place on the bridge. He could not comment on whether there were other places on the bridge that measured more than 25 feet, 10 inches, stating "[i]t might. It might not." Clary also admitted that he did not know if the two inch difference at that point on the bridge would have made any difference in the accident that occurred.
As to the claim that the bridge was too narrow, our review does not reasonably support a finding that the bridge roadway fell below the minimum standards. Even assuming it was too narrow at the point measured, the record contains no specific evidence of the requisite notice to DOTD, and Clary could not say that the narrowness caused the 1997 accident in question.
To support his assertion that the bridge should be designated a no-passing zone, Clary referred to the "Manual on Uniform Traffic Control Devices" (MUTCD) published by the Louisiana Department of Highways in 1949 and revised in 1954. According to the introduction contained in the 1954 edition, the MUTCD provided for the design, location, use and operation of signs, signals and markings and conformed, *475 as far as practicable, with nationally accepted standards.
Although Clary acknowledged that the MUTCD did not have a warrant mandating that a location be designated as a no-passing zone due to fog, he referred to a provision that described how a no-passing zone should be marked in "zones where overtaking and passing is hazardous." To show the zone was hazardous, he referenced statements made by Paul Smith, the sheriff of Pointe Coupee Parish, regarding accidents in the area of the bridge.
Sheriff Smith, who assumed office in 1996, testified that he had supervised countless accidents, ranging in severity from fatalities to minor accidents, on the Morganza Floodway Bridge since joining the sheriff's office in 1977. However, the sheriff did not testify that those accidents were specifically caused by the narrowness of the bridge, foggy conditions, or the absence of signs warning the public not to pass and to slow down in adverse weather. Further, the only notification from the sheriff directly to DOTD was a letter written after the accident at issue in this case. Regarding the hazard or danger encountered when traveling on the bridge during foggy weather conditions, Sheriff Smith did state that at times he had stopped and pulled over because "it was too bad to drive."
The state police officer who responded to the accident and a witness who observed the accident while traveling behind the Bowman vehicle both testified that on the date of the accident it was very foggy and that foggy conditions often occur in the area of the bridge. Thus, Clary opined that the bridge should have been designated as a no-passing zone to minimize the hazard posed while traveling on the bridge during foggy conditions and that the absence of that designation created an unreasonable risk of harm.
To refute this testimony, DOTD presented the testimony of Rick Robertson, who was accepted as an expert in road design, traffic engineering, accident reconstruction, and hydraulic engineering. Robertson opined that the Morganza Floodway Bridge was built in accordance with the minimum standards required at the time the bridge was built. He further testified that the 1988 edition of the MUTCD was applicable in determining whether the bridge was required to be marked and posted as a no-passing zone at the time of the accident. The 1988 MUTCD provides that "no-passing zones shall be established . . . on two- and three-lane highways where an engineering study indicates passing must be prohibited because of inadequate sight distances or other special conditions." Based on the provisions of the 1988 MUTCD, Robertson opined that there were no "permanent" sight restrictions on the bridge and therefore passing was allowable in accordance with the applicable MUTCD edition.
Robertson testified that if a no-passing zone was implemented when conditions did not warrant such an installation, it would simply be disregarded by the motoring public or create conditions of congestion that could be detrimental from a safety standpoint. Robertson did admit, however, that although there are no specific requirements to provide signing or traffic control measures for fog conditions, it can be done. He also acknowledged on cross examination that other than building a new bridge, the only way to attempt to prevent head-on collisions on the bridge would be to implement a no-passing zone that would have to be rigorously enforced. He further testified that "a history of bad accidents and at a time period when you became very aware of them and had done a detailed engineering study, . . . could be a justification for [implementing a no-passing *476 zone]." DOTD also presented the testimony of one of its engineers who had performed an engineering study after the accident and determined that implementation of a no-passing zone and reduction in the speed limit was not warranted.
In describing how the accident occurred, Bowman testified:
It was foggy off and on, but you could see pretty much  a pretty good distance in front of you. Like it would get a little foggy and then you could see, you know, it was clear, like there wasn't any fog at all. And somewhere along the line I come out, like, behind a  I don't know what kind of truck it was, a fuel truck, whatever, and I went to try to pass it and I never could pass it. Every time I would go to pass it I would see somebody coming.
* * *
Like right after you get on the spillway  when the road hits the front of the spillway it makes like a little turn and when you get on the spillway you can see all the way to the end of it.
* * *
And right after you get on the spillway I could see all the way to the end of it almost. And I didn't see anybody coming and that's when I decided to try to pass the truck up then and make my pass.
* * *
And I went to try to make my pass and I was watching between me, the truck, and the wall on my left so I could make the pass. I had my mind mostly on the truck and the wall and when I did decide to look up I still didn't see nobody. And I was even with the cab of the truck when I looked back up that's when I seen him approaching me. And nothing I could do.
Later, upon further questioning by the plaintiffs' attorney, Bowman stated, "I could see a good ways. It was no fog, that's why I decided to pass. I didn't see anything, it wasn't foggy, I didn't see anybody coming." On examination by counsel for DOTD, Bowman acknowledged that right before the collision he took his eyes off the road and looked at the truck. When he looked back, he observed Deependra's vehicle for the first time. However, Bowman also testified that if the bridge had been designated a no-passing zone, he would not have attempted to pass the eighteen-wheeler.
Although at times in his testimony Bowman seemed to indicate that the fog was not a factor in causing the accident, there was testimony from other witnesses about the poor visibility caused by fog on the date of the accident. Gracie Amos, who was traveling one vehicle behind Bowman on the date of the accident, testified, "[i]t was a very foggy day." The state police officer that investigated the accident, Lieutenant Craig Jewell, similarly testified, "[i]t was foggy on the bridge still. Seem like it might have been just a tad bit lighter but it was still very foggy."
Although the jury was not asked to and did not make a finding of whether fog obscured the roadway, considering all of the testimony on that issue, especially that of the state trooper, the independent witness, and Bowman's testimony that he did not observe the Charan vehicle until just before the crash, it is more likely than not that the jury did find that foggy conditions existed and visibility was low or impaired at the time of the accident. From our review, the record does not support a contrary finding that the roadway was clear. If it did, such a finding on this record would be manifestly in error.
*477 According to the testimony of several witnesses at the trial, including DOTD witnesses Lt. Jewell and Amos, as well as the plaintiffs' witnesses, Sheriff Smith and Clary, the poor visibility caused by fog in the area of the Morganza Floodway Bridge was a well-known and obvious hazard. The fog was an open and obvious hazard to the witnesses on the day of the accident.
In addition, DOTD introduced evidence of Bowman's convictions for DWI third offense and first degree vehicular injury. However, DOTD was precluded from introducing any evidence regarding a blood test that Bowman was administered on the date of the accident because the DOTD was unable to prove a sufficient chain of custody.
In recounting his actions prior to the accident, Bowman admitted that on the night before the accident he had been drinking. He could not remember exactly how many beers he had consumed, but said it was at least six. It was established that in his deposition testimony, Bowman stated that he stopped drinking at 2:00 a.m. and that he went to bed between 2:30 and 3:00 a.m. He could not recall those time periods at the time of trial, but he did remember getting up between 6:30 to 7:00 a.m. The accident occurred at 7:48 a.m.
Bowman testified that, on the morning of the accident, he was driving to his job in Houma, Louisiana, to find out about a crew change. Prior to the accident, he stopped at a restaurant at the foot of the bridge to have breakfast and also bought a case of beer, but said he did not drink any of the beer. At trial, despite the DWI conviction, he denied being impaired at the time of the accident by either intoxication or sleep deprivation.
Finally, Amos, the witness who was traveling behind Bowman and observed the accident first hand, testified that Bowman had passed her at a high rate of speed before entering the bridge, and was driving erratically at the time of the accident. In describing Bowman's driving, Amos testified, "while he was trying to pass he must have lost control, his truck became entangled into the bridge and he was fighting it trying to get back into whatever lane." She further stated, "[Bowman's truck] was up and down. On the curb, off the curb, into the wall, it was wild." Amos did not testify that she or any other vehicle had trouble navigating the bridge.
The record before us is devoid of evidence showing that, before the accident in question, DOTD had actual or constructive notice of even one accident specifically caused by foggy conditions on the bridge. General knowledge that fog exists in Louisiana, particularly along waterways and bridges, and general reports of traffic accidents on the bridge roadway, do not amount to constructive notice that multiple accidents were being caused by foggy conditions on the bridge and could be avoided by the warning signs. The sheriff did not ask DOTD for warning signs before the accident in question, and the sheriff's testimony did not link the prior accidents to adverse weather conditions or fog. Thus, the lack of notice, actual or constructive, defeats plaintiffs' claim.
We also note that, at the time the bridge was built, the applicable regulations required the signage sought by plaintiffs only when a driver's line of sight was impaired, such as a sharp bend in the roadway, or for "other special conditions." In this case, no such line of sight obstruction or impairment existed on the roadway and the foggy condition at the time of the accident was a physical condition that was open and obvious to the motorists. Given the adverse weather conditions, even in the absence of warning signs limiting passing or the speed limit, Bowman had a heightened duty as a motorist to *478 maintain control of his vehicle and proceed cautiously until the conditions improved, which would include slowing down and not passing until he had a view of the left lane unimpaired by fog or foggy patches. See Kimble, 95-1973 at p. 8, 673 So.2d at 687. Bowman, who also admittedly took his eyes off the road while attempting to pass, had no right to assume that the left passing lane was open before him and to proceed without regard to the safety of others. See O'Rourke, 157 So. at 606. In addition, there was no evidence presented that drivers would have been able to see posted warning signs through the fog.
Under these particular facts, especially Bowman's DWI conviction and the essentially unrefuted testimony of the independent witness that Bowman was driving erratically and passing in fog, considered in light of the duty placed on a passing motorist and the heightened duty required of a motorist during obvious adverse weather conditions, we find that Bowman was the sole cause of the accident in question. On this record, we find no basis to find that DOTD had or breached a duty to post signs warning drivers of the obvious danger of passing and speeding under the facts present in this case. Thus, plaintiffs failed to meet their burden of proof on causation.

CONCLUSION
Based on the foregoing discussion, we find that the jury erred in finding DOTD liable. We reverse the judgment appealed and dismiss the suit against DOTD. The costs of this appeal are assessed to the plaintiffs.
REVERSED AND RENDERED.
GUIDRY, J., dissents and assigns reasons.
GAIDRY, J., concurs in the result and assigns reasons.
GUIDRY, J., dissenting.
I disagree with the majority opinion finding the jury's determination that DOTD was partially liable for the life-threatening automobile collision that occurred on the Louisiana Highway 1 bridge spanning the Morganza Floodway on August 31, 1997 is erroneous. I disagree with the majority's assertion that the plaintiffs failed to prove that DOTD had notice of the defects in a structure that it constructed or that DOTD properly regulated traffic on the structure. DOTD clearly failed to address foggy conditions that were so prevalent and customary as to be the source of countless accidents in the area of the structure, which it could have done by simply designating the area a no passing zone.
In reviewing this matter, our inquiry is whether a reasonable factual basis exists to support the conclusions reached by the jury and whether such a conclusion is clearly wrong. See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). The plaintiffs' engineering expert, James Clary, opined that the bridge should have been designated as a no passing zone to minimize the hazard posed while traveling on the bridge during foggy conditions and that the absence of that designation created an unreasonable risk of harm. DOTD's engineering expert, Rick Robertson, admitted that although there are no specific requirements to provide signing or traffic control measures for fog conditions, it can be done. He also acknowledged that other than building a new bridge, the only way to prevent headon collisions on the bridge would be to implement a no passing zone. He testified, "a history of bad accidents and at a time period when you became very aware of them and had done a detailed engineering study . . . could be a justification for [implementing a no passing zone]." The *479 jury was also presented with testimony from local law enforcement officials regarding the history of bad accidents in the area of the structure and the foggy conditions existing in the area. The defendant, James Bowman, testified that he would never have attempted the passing maneuver had the area been designated a no passing zone.
Nevertheless, the majority asserts, "there was no evidence presented that drivers would have been able to see posted warning signs through the fog." However, designation of the area as a no passing zone is not limited to signage, but could also include reflective markings or striping on the roadway expressly designed to be visible under conditions of low visibility, such as fog. The plaintiffs' expert, Clary, testified extensively regarding the availability and relatively low cost of providing signage and striping for the roadway to designate the area a no passing zone.
According to the record, the fact and expert witnesses offered the jury two plausible versions of how this accident occurred and two contradictory conclusions regarding the defective condition of the structure. The manifest error standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). As the fact finder, the jury was in the best position to review the evidence presented and make those findings regarding whether a defective condition existed, notice, and causation. Under the applicable standard of review, where there are two permissible views of the evidence, a fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 883 (La.1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. See Stobart, 617 So.2d at 882-83.
Accordingly, for the foregoing reasons, I respectfully dissent from the majority's opinion herein.
GAIDRY, J., concurring.
I concur in the result reached by the majority, but I disagree with its position on the issue of notice to DOTD as to any "defective" condition of the bridge and the prevalence of foggy conditions on the bridge. In my view, the determinative factor in this matter is the insufficiency of evidence that any defect or fog was either a cause-in-fact or a contributing legal cause of this tragic accident. I similarly find, based upon the evidence, that the absence of signage played no causal role under the facts of this particular accident.
NOTES
[1] Based on our finding that DOTD was not at fault, we pretermit discussion of the plaintiffs' answer to the appeal.
[2] The State redesignated the newly constructed portion of Louisiana Highway 30 that provided the "high level crossing" as Louisiana Highway 1.
[3] At trial, Clary referred to the 1979 version of the statute and specifically referred to the following parenthetical comment contained in the 1979 statute: "(NOTE: Sections between Raceland and Donaldsonville and between Livonia and Morganza on projected location)."