JjMICHAEL E. KIRBY, Judge.
[1]In these consolidated cases, the State of Louisiana Through the Department of Transportation and Development (“DOTD”), appeals a trial court judgment finding it 30% at fault for injuries suffered by plaintiffs Carl Johnson and Jocenta Ferrouillet in a February 15, 1994 automobile accident.
On February 15, 1994, at approximately 4:45 a.m., a vehicle operated by Myron Harris and insured by State Farm Mutual Automobile Insurance Company (“State Farm”) entered the Elysian Fields exit of 1-10 East and collided head-on with a vehicle operated by Jocenta Ferrouillet. Plaintiff, Carl Johnson, was a guest passenger in Harris’ vehicle. In separate actions that were later consolidated, Johnson and Ferrouillet each filed suit against Harris, State Farm and DOTD. Ferrouillet filed her suit individually and on behalf of her minor son, Keith. Ferrouillet’s older son, Eric Ferrouillet, Jr., was also listed as a plaintiff, but dismissed his claim for loss of services before trial began.
Following trial, a jury found Harris and State Farm 70% at fault for the accident, and found DOTD 30% at fault. The jury found no negligence on the part of DOTD, but found that the absence of signs created a defect in the Elysian Fields Lexit ramp for which DOTD was strictly liable. The jury awarded damages totaling $1,121,892.00 to Jocenta Ferrouillet, $166,623.00 to Carl Johnson and $2,500.00 to Keith Ferrouillet. The trial court found that the jury verdict should be made the judgment of the court, and rendered judgment accordingly. Both the DOTD and Carl Johnson subsequently filed motions for judgment notwithstanding the verdict or, alternatively, motions for new trial. The trial court denied the DOTD’s motions, but granted Johnson’s motion for judgment notwithstanding the verdict and increased his general damage award from $5,000.00 to $200,000.00. DOTD appealed.
On appeal, the DOTD first argues that the jury erred in assigning 30% fault to it because the evidence showed that Harris was 100% fault for the accident. In its interrogatories, the jury found that the absence of signs created a defect in the Elysian Fields exit ramp that caused injuries to the plaintiffs. In order for DOTD to be held strictly hable in this case, the plaintiffs had the burden of proving (1) that the thing that caused the damage was in the DOTD’s care, custody and control; (2) that the thing had a vice, ruin, or defect that presented an unreasonable risk of harm; and (3) that the vice, ruin or defect was the cause-in-fact of the plaintiffs dam *688 ages.[2] Lasyone v. Kansas City Southern Railroad, 2000-2628, PP. 6-7 (La.4/3/01), 786 So.2d 682, 689. To recover, plaintiff bears the burden of proving these elements in the affirmative, and the failure on any one is fatal to the case. Id.
It is undisputed that the exit ramp where the accident occurred was in the care, custody and control of the DOTD. Therefore, the issues before us are | ¡^whether inadequate signage rendered this roadway defective and was a cause of this accident.
Inadequate traffic signs may create an unusually hazardous risk to a driver exercising reasonable care and prudence, and the DOTD may be liable for damage caused by that hazardous condition. Menard v. City of Lafayette, 2001-4, p. 4 (La.App. 3 Cir. 5/23/01), 786 So.2d 354, 357, citing Burge v. City of Hammond, 509 So.2d 151 (La.App. 1 Cir.1987). Furthermore, the DOTD has a duty to maintain the public highways in a condition that is reasonably safe not only for persons exercising care and reasonable prudence, but also for those who are slightly exceeding the speed limit or who are momentarily inattentive. Bullard v. State, Department of Transportation and Development, 98-1942 (La.App. 1 Cir. 11/5/99), 744 So.2d 212. However, the scope of DOTD’s duty to maintain highways in a safe manner does not include the risk of injury or death caused by the gross negligence of a third party motorist. Curry v. Johnson, 590 So.2d 1213 (La.App. 1 Cir.1991).
The breach of duty is a question of fact, or a mixed question of law and fact, and the reviewing court must accord great deference to facts found and inferences drawn by the finder of fact. Harvey v. State, Department of Transportation and Development, 2000-1877, p. 3 (La.App. 4 Cir. 9/26/01), 799 So.2d 569, 573, writ denied, 2002-0003 (La.3/15/02), 811 So.2d 910. Causation is a question of fact and the trier of fact’s determinations are entitled to great weight and cannot be disturbed absent manifest error. Id.
The evidence showed that as Harris exited the truck stop parking lot, he turned in a slightly southbound direction while on one of the northbound lanes of Elysian Fields. He crossed Elysian Fields in a diagonal direction facing |4northbound traffic, and then crossed a divider lane marked with white stripes and reflective markers before reaching the bottom of the Elysian Fields I — 10 East exit ramp. He entered the exit ramp and drove up the ramp until his car collided head-on with a car driven by Jocenta Ferrouillet.
The plaintiff and the DOTD both presented the testimony of experts in the field of traffic safety and engineering. Dr. Olin Dart was accepted as an expert in traffic engineering and traffic safety. Dr. Dart said that after plaintiff retained him in May 1994, he went to the accident site and took measurements and photographs and evaluated the site. The plaintiff introduced those photographs into evidence. Dr. Dart studied the layout of the design of the ramp where the accident occurred and the traffic control devices at that location, where the Elysian Fields exit from I-10 East merges with northbound Elysian Fields Avenue. He concluded that this location was unsafe and had inadequate traffic control devices to prevent the type of accident that occurred. When asked if there were signage' to prevent a motorist *689 from coming out of the Mardi Gras Truck Stop and turning the wrong way, Dr. Dart testified that signage itself cannot prevent someone from doing something wrong. However, he stated that if a sign were there and a motorist had the opportunity to evaluate the sign, hopefully that motorist would make the right decision.
Dr. Dart testified that the exit ramp in question was not uncommon, but the manner in which traffic from the 1-10 East exit ramp at Elysian Fields merges into Elysian Fields northbound in the inside left lane is unique. His opinion is that DOTD should have added the following signs: 1) a “No Left Turn” sign at the truck stop exit, 2) a one-way sign on the median of Elysian Fields pointing northbound, 3) a “Do Not Enter” sign at the base of the exit ramp, and 4) a “Wrongs Way” sign further up the ramp. His opinion was that the DOTD’s failure to place either one or a combination of these signs rendered the area of the bottom of the ramp unreasonably dangerous, especially for motorists coming out of the truck stop.
Dr. Dart explained that the Manual on Uniform Traffic Control Devices (“MUTCD”) was compiled and is periodically revised by a national committee on the subject of how traffic signs, traffic signals and pavement markings should be placed on roadways. He stated that Louisiana has adopted the provisions of the national manual verbatim. There is no provision in the manual dealing with the placement of signs for the specific type of exit ramp at issue in this case. The sections of the manual covering “Do Not Enter” signs in general state that such signs should be conspicuously placed to prohibit traffic from entering a restricted roadway section. Dr. Dart said this is advisory language as to what is recommended, but the manual does not make the placement of such signs mandatory. Regardless of the lack of any requirement in the MUTCD to place signs at this exit ramp, Dr. Dart still opined that the failure to put a “Do Not Enter” or “Wrong Way” sign at the bottom of the exit ramp at issue rendered the ramp unsafe.
Dr. Dart’s opinion is that the DOTD should have installed one-way signs even though Elysian Fields is a large roadway with three northbound lanes and three southbound lanes and a middle lane with markings on the pavement. He based that opinion on the fact that there is a lot of traffic coming out of the Mardi Gras Truck Stop onto Elysian Fields. He said that a driver coming out of the truck stop and looking for a way to get back on I — 10 East would not have a sign at that location telling him how to do so. Dr. Dart said that a driver coming out of the |fitruck stop would have to either go ten blocks north, turn right onto 1-610 and merge into I — 10 East, or go up eight blocks and make a U-turn to get back to the I — 10 East onramp.
On cross-examination, Dr. Dart said that the MUTCD does not mandate “No Left Turn” signs at the driveway for this truck stop. The MUTCD also does not mandate “One-Way” signs opposite the driveway of the truck stop. The MUTCD does not mandate “Do Not Enter” signs for this particular type of exit ramp coming off I-10 and merging into Elysian Fields. Rather, the language in the MUTCD regarding these types of signs is permissive only. Dr. Dart testified that he considered the placement of such signs in this type of area to be good practice, but the law does not require them. He admitted that the design of the exit ramp at issue is acceptable by design standards.
Dr. Joseph Blaschke testified on behalf of the DOTD, and was accepted as an expert in highway design, highway safety and traffic control devices. His opinion is that there is nothing wrong with the de *690 sign of the exit ramp off I — 10 onto Elysian Fields. He said it is unique, but not unusual, and that many similarly designed ramps can be found in some of the older cities in the United States where a newer freeway system had to be built to fit in with an existing network of streets. Dr. Blasehke said none of the signs recommended by Dr. Dart are mandatory under the MUTCD. He said it is not uncommon to take an exit ramp and end up on the inside left lane of a street, such as is the case with the exit ramp at issue. He said he does not consider the area where the driveway of the truck stop meets Elysian Fields to be an intersection in the commonly understood use of that word.
Dr. Blasehke stated that he disagreed with Dr. Dart’s opinion that “No Left Turn” signs should have been placed at every driveway of the truck stop. He said |7that the driveway of the truck stop intersects with a divided arterial street, so it should not be confusing to drivers to know which direction they should go. He said the only way he would recommend putting such a sign is if there were proven problems with people turning-left and traveling on the wrong side of the street. He stated that if there were a requirement to put “No Left Turn” signs any time a driveway runs into a divided arterial street, there would be hundreds of thousands of these signs in the City of New Orleans, and thousands in the downtown area alone.
He also disagreed with Dr. Dart’s opinion that a “One-Way” sign should have been placed on the divider in the middle of Elysian Fields because this is not a one-way street; rather, it is a two-way street with a divider in the middle. Dr. Blasehke disagreed with Dr. Dart’s opinion that “Do Not Enter” and ‘Wrong Way” signs should have been placed by the exit ramp because it is very difficult for any driver to make the maneuver to enter the exit ramp. Furthermore, he said that not only does the law not require such signs, but also placement of such signs could confuse a driver by making him think he is on the right side of the road because he has signs facing him.
Dr. Blasehke said that the only way for a driver to enter the exit ramp at issue is to be going the wrong way on Elysian Fields. He said a driver coming out of the truck stop onto Elysian Fields could tell he has to turn right because the overhead traffic signs are facing drivers going in that direction, whereas if a driver turned left he would be facing the backs of signs and know that he was going in the wrong direction. Dr. Blasehke stated that the police report taken after the accident indicated that the area was lighted continuously-
IsDr. Blaschke’s opinion is that the cause of this accident was Mr. Harris’ entering the ramp the wrong way. His opinion is that there was no defect in the exit ramp that caused or contributed to this accident. His opinion is also that there was no defect in the signs and traffic information in the area that caused or contributed to the accident. He said any driver who would turn left onto Elysian Fields when coming out of the truck stop and enter the exit ramp is not an alert driver.
He acknowledged the testimony of the assistant manager of the truck stop who stated that there were two other accidents in the five-year period following this accident where drivers turned left onto Elysian Fields from the truck stop driveway and entered the exit ramp. However, he said that information alone would not be enough for him to recommend extra signage in this area. He said he would need to know what the contributing factors to the other accidents were, and find out whether additional signs would have made a difference.
*691 At trial, the issue of Myron Harris’ alleged impairment at the time of the accident was addressed. Harris testified that in the weeks leading up to the accident, he was an occasional cocaine user and a daily marijuana user. He said that prior to the early Tuesday morning accident of February 15, 1994, he had not used cocaine since the previous Saturday or Sunday. He said he had last used marijuana on that previous Sunday night. He claims that from the time he woke up on Monday, February 14th until the accident in the early morning hours of the 15th, he had not used any cocaine or marijuana. Mr. Harris said that he only had one beer from Monday morning until the accident early Tuesday morning. He said that he stayed out in the French Quarter until shortly before the accident, but that he did not drink any alcohol after midnight. He said he bought some beer at the truck | flstop right before the accident, but he not consumed any of it before the accident. Mr. Harris’ testimony indicated that he had been awake for twenty consecutive hours at the time of the accident.
On cross-examination, Mr. Harris admitted that he normally shared five to ten marijuana cigarettes a day with friends. When asked at his earlier deposition about how much marijuana he smoked on the Sunday before the accident on Tuesday morning, his response was “I would smoke weed basically all day.” Also on cross-examination, Harris admitted that before he left the truck stop, he saw the divider lane that separated the far left northbound lane of Elysian Fields from the other two northbound lanes but he decided to drive across that divider lane to get to the far left lane, which he thought was the entrance ramp to the I — 10.
Dr. William George was accepted by the court as an expert in the field of pharmacology and toxicology. He was hired by the DOTD to analyze toxicology tests performed on Myron Harris after the accident in order to determine his degree of impairment and whether that impairment had an impact on him at the time of the accident. He said laboratory tests performed on Mr. Harris at Charity Hospital 1 /£ hours after the accident were positive for cocaine and marijuana. He said that based on the level of cocaine in Mr. Harris’ system, his opinion was that he had used cocaine within 1/é to 2 days before the accident. He said the level of marijuana in Mr. Harris’ system showed that he was an active user. Mr. Harris’ blood alcohol level was .014, which Dr. George said showed the presence of alcohol but was not enough for Mr. Harris to be classified as driving while intoxicated.
Dr. George’s opinion is that Myron Harris was very impaired at the time of the accident. His further opinion is that this impairment affected Mr. Harris’ |inability to drive an automobile. He stated that a person could be impaired without being intoxicated. His opinion is that Mr. Harris’ impairment was a significant contributing factor in the accident.
Dr. George analyzed laboratory tests performed on Myron Harris shortly after the accident and concluded that he was impaired at the time of the accident, and that this impairment affected his ability to drive an automobile. At the time of the accident, Mr. Harris had cocaine, marijuana and alcohol in his system, and he had been awake for twenty hours straight. By his own admission, he saw the divider lane separating the ramp lane from the other two northbound lanes of Elysian Fields, yet he chose to drive across the divider lane to get to what he thought was an entrance ramp. The photographs introduced into evidence show that the divider lane was painted with white striping and lined with reflective markers. The photo *692 graphs also show that Mr. Harris was faced with the backs of the overhead travel signs when he pulled out of the truck stop parking lot and crossed the divider lane before entering the exit ramp.
We find that Mr. Harris was grossly negligent in the operation of his vehicle and that his negligence was the sole cause of the accident that resulted in injuries to plaintiffs. Even plaintiffs expert, Dr. Dart, stated that signage alone could not prevent a driver from doing something wrong. Mr. Harris’ actions cannot be classified as momentary inattentiveness. He made a series of negligent choices, including driving while impaired, crossing a clearly marked divider lane on a major thoroughfare, and ignoring the fact that he was facing the backs of overhead travel signs when he turned out of the truck stop parking lot. Despite being faced with the backs of these overhead signs, which should have signaled to Mr. Harris Inthat he was traveling in the wrong direction, he proceeded to enter the exit ramp and kept driving up that ramp until the collision.
We find that the jury erred in finding that inadequate signage was a cause of this accident, and the trial court erred in adopting this jury finding as the judgment of the court. The evidence in this case established that the sole cause of the accident was Mr. Harris’ grossly negligent operation of his vehicle. The judgment of the trial court assessing liability against DOTD was manifestly erroneous and is hereby reversed.
DOTD also sets forth several assignments of error regarding quantum. However, our determination that DOTD is not liable for plaintiffs’ damages renders those issues moot.
For the reasons stated above, the judgment of the trial court finding the DOTD liable for 30% of plaintiffs’ damages is reversed. Judgment is hereby rendered finding defendant Myron Harris 100% liable for the plaintiffs’ damages from the accident of February 15,1994.
REVERSED AND RENDERED.
GORBATY, J., dissents with reasons.
MURRAY, J., dissents.

. This opinion was signed by Judge Steven R. Plotkin prior to his retirement on December 31, 2002.

. Because the accident in this case occurred prior to November 23, 1995, the effective date of the reenacted version of La. R.S. 9:2800, the plaintiffs did not have to satisfy the notice requirements of that statute. See, Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14.