# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

**17-52 consolidated with 17-567, 17-568**

**RONALD LEE STUTES, ET UX.**

**VERSUS**

**GREENWOOD MOTOR LINES, INC., ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20131119
HONORABLE DAVID MICHAEL SMITH, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**ELIZABETH A. PICKETT**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, John E. Conery, and Candyce G. Perret, Judges.

Conery, J., concurs in the result and assigns reasons.

**AFFIRMED.**

**H. Alston Johnson III**
**Marshall M. Redmon**
**Virginia Y. Dodd**
**KevinW. Welsh**
**Phelps Dunbar LLP**
**II City Plaza**
**400 Convention Street, Suite 1100**
**Baton Rouge, LA 70802-5618**
**(225) 346-0285**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **American Guarantee and Liability Insurance Company**

**Blake R. David**
**Robert B. Brahan, Jr.**
**Broussard & David**
**Post Office Box 3524**
**Lafayette, LA 70502-3524**
**(337) 233-2323**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
    **Ronald Lee Stutes**
    **Carroll Lynn Stutes**

**J. Marshall Montgomery**
**Attorney at Law**
**802 Johnston Street**
**Lafayette, LA 70501**
**(337) 269-0083**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
    **Ronald Lee Stutes**
    **Carroll Lynn Stutes**

**Jeff Landry**
**Attorney  General**
**Laura L. Putnam**
**Assistant Attorney General**
**Louisiana Department of Justice**
**556 Jefferson Street, 4th Floor**
**Lafayette, LA 70501**
**(337) 262-1700**
**COUNSEL FOR DEFENDANT-APPELLEE:**
    **State of Louisiana, through the**
    **Department of Transportation & Development**

**PICKETT, Judge.**

This matter arises from a collision that occurred between a pickup truck and an eighteen-wheeler tractor-trailer when the driver of the eighteen-wheeler drove across an intersection in dense fog that limited the vision of both drivers. The driver of the pickup truck suffered catastrophic injuries. He and his wife sued the driver of the eighteen-wheeler, his employer, and the employer's primary and excess insurers. After a jury trial, the jury found the driver of the eighteen-wheeler to be solely at fault and awarded the plaintiff damages exceeding $30 million. One excess insurer appeals the jury's verdict. For the following reasons, we affirm the judgment of the trial court.

## DISCUSSION

The facts of how the accident occurred are not at issue. In the early morning hours of January 23, 2013, Gerald Pitre, an employee of Greenwood Motor Lines, Inc. d/b/a R&L Carriers, was operating his R&L eighteen-wheeler on the outskirts of Lafayette, upon return to R&L Carriers' facility in nearby Scott from his regular overnight roundtrip to Houston, Texas. Mr. Pitre traveled to Houston and back to Lafayette on Interstate 10 between 9:00 p.m. on January 22 and 5:30 a.m. on January 23. According to Mr. Pitre, he had driven back from Houston in fog that he described as "heavier than ever," and he could only see what was within the area illuminated by his headlights.

Mr. Pitre exited Interstate 10 at Duson onto Austria Road and drove south to where Austria Road intersects with U.S. Highway 90 (the Intersection). The Intersection was controlled with stop signs and two red flashing signals for motorists on Austria Road and a yellow flashing signal for motorists on Highway 90. Mr. Pitre stopped when he reached the Intersection at which time he noticed a burning smell that he believed was coming from his trailer. He contacted the R&L

dispatcher to report the burning smell and informed the dispatcher that he was going to drive to where he could safely stop and inspect the trailer to determine the cause of the burning smell.

Mr. Pitre explained that he originally intended to turn left at the Intersection, but after speaking with the dispatcher, he decided to drive straight across Highway 90 to stop and inspect his trailer. He further explained that when he ended his conversation with the dispatcher, he looked at the Intersection, saw two cars pass through it, "waited a few seconds," then drove through it. Mr. Pitre also testified that the fog at the Intersection was such that that although the vehicles traveling on Highway 90 had their headlights on, he could not see them until they "crossed right in front of my face."

At the same time, Ronald Stutes was traveling to work on Highway 90. As he approached the Intersection, Mr. Stutes saw the eighteen-wheeler crossing the Intersection. He slammed on his brakes but was unable to stop or swerve to avoid the tractor-trailer, and he crashed into the rear wheel of the tractor-trailer. Mr. Stutes testified that although it was foggy, he could see the Intersection. As he crossed the Intersection, Mr. Pitre heard a crunching sound, but he was unaware that a vehicle had hit his trailer and continued traveling approximately 500 feet down Austria Road. Mr. Pitre testified that he never saw Mr. Stutes' vehicle before the accident.

Mr. Stutes suffered very serious injuries and is now a paraplegic with paralysis from his chest down; he is unable to care for himself. His injuries include thoracic spine fractures at T4, T5, and T6 that required fixation with screws and rods from T2-8; a cervical spine injury at C7; a transverse process fracture with cervical spine injury; contusions in his cervical and thoracic spine; collapsed lungs; a cerebral concussion; a brain injury; a comminuted humerus/

neck fracture; and numerous other injuries. The evidence indicates that Mr. Stutes' limbs and most of his internal organs were damaged or impaired in some way in the accident or as a result of his injuries. Additionally, after the accident, Mr. Stutes developed diabetes.

Mr. Stutes and his wife, Carroll,[1] filed suit against Mr. Pitre; R&L Carriers; Greenwood Motor Lines, Inc.; R&L Carriers, Inc.; R&L Carriers Shared Services, LLC; R&L Transfer, Inc.; Protective Insurance Company; Lexington Insurance Company; Zurich American Insurance Company; and American Guarantee and Liability Insurance Company (AGLIC). In their answers, the defendants asserted affirmative defenses including fault of Mr. Stutes and fault of a third party, the Louisiana Department of Transportation and Development (DOTD). The Stuteses then added DOTD as a defendant.

Prior to trial, DOTD filed a motion for summary judgment, seeking dismissal of the claims asserted against them on the basis that neither the Stuteses nor the defendants could carry their burden of proving liability against them. The Stuteses also filed a motion for summary judgment in which they sought the dismissal of DOTD on that same basis. After a hearing, the trial court granted the motions for summary judgment and dismissed DOTD from this suit.

Prior to trial, Mr. Stutes entered into a Partial Settlement Agreement with Mr. Pitre, the R&L entities, and Protective Insurance Company in which those defendants tendered a sum of money less than $4 million dollars in exchange for being dismissed from the litigation. Pursuant to the Agreement, the Stuteses reserved their rights to proceed against R&L's excess insurers, Zurich and AGLIC, as authorized in *Futch v Fidelity & Casualty Co. of New York*, 246 La. 688, 166

---

[1] The Stuteses' daughter, Ashely, also filed suit against the defendants but later dismissed her claims with prejudice.

So.2d 274 (1964) and *Gasquet v. Commercial Union Insurance Co.*, 391 So.2d 466 (La.App. 4 Cir. 1980), *writs denied*, 396 So.2d 921, 922 (La.1981). Pursuant to the Agreement, Zurich and AGLIC received a credit of $4 million against any judgment obtained against them.

After a jury trial, the jury awarded Mr. Stutes damages totaling $30,138,225 and awarded Mrs. Stutes $300,000 for loss of consortium. On November 3, 2016, the trial court signed a judgment memorializing the jury's verdict. Thereafter, Lexington filed a motion for new trial and alternative motion for judgment notwithstanding the verdict, and AGLIC filed a motion for new trial and alternatively for remittitur and alternative motion for judgment notwithstanding the verdict. The trial court denied the motions. Lexington and AGLIC each appealed; Lexington dismissed its appeal before filing an appellate brief.

## ASSIGNMENTS OF ERROR

AGLIC assigns the following errors with the trial court proceeding:

1. The trial judge erred in granting the pre-trial motions of the plaintiffs and [] DOTD for summary judgment, resulting in the omission from the jury verdict form of any possibility for the jury to assign a percentage of fault to [] DOTD.

2. The trial judge erred in permitting the jury to consider a life care plan based on the life expectancy of a person without the serious injuries that Stutes had, and erred in denying post-judgment relief on this basis.

3. The jury erred in awarding grossly excessive general damages to Ronald Stutes for his injuries, and the trial judge erred in denying the post-judgment relief sought by appellant to reduce those damages

*Summary Judgment*

AGLIC first assigns error with the trial court's grant of DOTD's and the Stuteses' motions for summary judgment which prevented AGLIC from arguing to the jury that the Intersection was unreasonably dangerous and prevented the jury

4

from assigning a percentage of fault to DOTD. The Stuteses named DOTD as a defendant because the R&L defendants pleaded the affirmative defense of fault of a third party, alleging that DOTD was negligent for failing to install a three-phase signal[2] at the Intersection and that its negligence contributed to the accident. DOTD filed a motion for summary judgment, arguing that a three-phase signal was not required at the Intersection and that it was not negligent for not installing one. The Stuteses followed suit and filed their own motion for summary judgment, seeking the dismissal of DOTD on the same grounds asserted by DOTD.

Appellate courts review the grant or denial of a motion for summary judgment de novo, "using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; *i.e.* whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law." *Samaha v. Rau*, 07-1726, p. 4 (La. 2/26/08), 977 So.2d 880, 882; La.Code Civ.P. art. 966(A)(3). The party that files a motion for summary judgment bears the burden of proof on the motion. La.Code Civ.P. art. 966(D). If, however, the moving party will not bear the burden of proof at trial on the issue addressed in the motion and points out that there is an "absence of factual support for one or more elements essential to the adverse party's claim, action, or defense[,]" the non-moving party must then produce evidence showing that a genuine issue of material fact exists "or that the mover is not entitled to judgment as a matter of law." La. Code Civ.P. art. 966(D)(1). If the non-moving party then fails to produce such evidence, "there is no genuine issue of material fact[,] and summary judgment will be granted." *Bufkin v. Felipe's La., LLC*, 14-288, p. 3 (La. 10/15/14), 171 So.3d 851, 854.

---

[2] A three-phase signal is traffic signal with red, yellow, and green lights

5

With regard to their claims that DOTD was at fault for the accident, AGLIC had the burden of proving that: (1) the accident occurred on property in DOTD's custody or control; (2) the property was defective because it contained a condition that created an unreasonable risk of harm; (3) DOTD had actual or constructive notice of this defect; and (4) the defect was the cause-in-fact of the injury. *Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So.2d 791. In its motion for summary judgment, DOTD asserted that discovery by the parties revealed an absence of support for the Stuteses' and AGLIC's claims that the Intersection was defective and/or was a substantial factor in causing the accident. In their motion for summary judgment, the Stuteses urged the same arguments DOTD asserted in its motion.

DOTD has a "duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence." *Id.* at 799. This duty requires DOTD to use appropriate signage and traffic signals. *Skulich v. Fuller*, 46,733 (La.App. 2 Cir. 12/14/11), 82 So.3d 467. It does not, however, make DOTD "the guarantor for the safety of all of the motoring public or the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances." *Forbes v. Cockerham*, 08-762, 86-770, pp. 31-32 (La. 1/21/09), 5 So.3d 839, 858. "Whether DOTD has breached its duty to the public depends on all the facts and circumstances determined on a case by case basis." *Id*. at 859. The occurrence of an accident is not an inference that an unreasonable risk of harm exists. *Netecke v. State ex rel. DOTD*, 98-1182, 98-1197 (La. 10/19/99), 747 So.2d 489. "DOTD's duty to maintain highways in a safe manner does not include the risk of injury or death caused by the gross negligence of a third party motorist." *Ferrouillet v. State ex rel. Dep't of Transp.*

*& Dev.*, 02-576, 02-577, p. 3 (La.App. 4 Cir. 1/15/03), 836 So.2d 686, 688, *writs denied*, 03-751 (La. 5/9/03), 843 So.2d 402; 03-756 (La. 5/9/03), 843 So.2d 403.

At the Intersection, Highway 90 is a two-way, two-lane highway situated in an east-west direction. It has separate left-turn lanes on both approaches to the Intersection. Austria Road is also a two-lane, two-way highway; it travels north-south and intersects Highway 90 at a right angle. Traffic on Austria Road at the Intersection is controlled by stop signs and overhead flashing signals. A yellow flashing signal faces Highway 90 traffic, and a red flashing signal faces Austria Road.

As a driver faced with a red flashing signal and a stop sign, Mr. Pitre's actions at the Intersection were governed by La.R.S. 32:234 and La.R.S. 32:123(B). Louisiana Revised Statutes 32:234 provides, in pertinent part:

> A. Whenever an illuminated flashing red or yellow signal is used in a traffic sign or signal, it shall require obedience by vehicular traffic as follows:
>
> (1) FLASHING RED [STOP SIGNAL]—When a red lens is illuminated with rapid intermittent flashes, drivers of vehicles shall stop before entering the nearest cross-walk at an intersection or at a limit line when marked, or, if none, then before entering the intersection, and the right to proceed shall be subject to the rules applicable after making a stop at a stop sign.

Louisiana Revised Statutes 32:123(B) defines the duty of the motorist at an intersection regulated by a stop sign:

> B. Except when directed to proceed by a police officer or traffic-control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the cross walk on the near side at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard.

7

In *Charan v. Bowman*, 06-882, p. 11 (La.App. 1 Cir. 8/1/07), 965 So.2d 466, 474 (citations omitted), *writ denied*, 07-1773 (La. 11/9/07), 967 So.2d 505, the first circuit addressed the care that must be exercised by drivers driving in conditions, such as fog, that limits their ability to see, explaining:

> A driver does not have the right to assume the course of travel is free from danger if he cannot see clearly ahead. If he continues to travel as if he knew there was perfect clearance, he does so at his own risk and peril. Further, a motorist is held to a higher degree of care in adverse conditions, and his duty to keep his vehicle under control increases in periods of low visibility. Adverse driving conditions call for unusual caution on the part of motorists. If conditions warrant it, the motorist may be required to slow or pull over and stop until the visibility improves. If the adverse condition or defect is open and obvious, defendants [including DOTD] may have no duty to protect or warn against the hazard and the condition may not be unreasonably dangerous.

AGLIC defended against the motions for summary judgment, arguing that the Intersection is unreasonably dangerous because DOTD should have installed a three-phase signal at the Intersection and that a three-phase signal would have prevented the accident. AGLIC supported these contentions with the testimony of David Krauss, Ph.D., an expert in human factors, and Tony Tramel, a civil engineer who practices in the fields of transportation engineering and transportation safety and planning. Dr. Krauss testified that because Mr. Pitre obeyed the stop sign/red flashing signal and stopped at the Intersection, he would have obeyed a three-phase signal and entered the Intersection only when the light facing him was green.

Mr. Tramel evaluated the Intersection under directives outlined in the Manual on Uniform Traffic Control Devices (MUTCD)[3] by collecting information

---

[3] The MUTCD is the nationally accepted engineering treatise published by the Federal Highway Administration which provides guidelines and recommendations for the standardization of traffic control devices, such as signs and signals, nationwide. DOTD has adopted the MUTCD as the minimum safety standards for highway design, construction, and maintenance. La.R.S. 48:3513.

regarding traffic conditions at the Intersection and opined that a three-phase signal should have been installed at the Intersection. He based his opinion on data concerning four Traffic Signal Warrants[4] enumerated in the MUTCD: eight-hour traffic volume, four-hour traffic volume, peak hour traffic, and roadway network. Mr. Tramel concluded that these four warrants were met or exceeded. Mr. Tramel concluded that these four warrants were met or exceeded.

Mr. Tramel determined that the conditions existing at the Intersection "exceed the guidelines used by traffic engineers, in conjunction with their engineering judgment, to justify the installation of a traffic signal at the subject location" and opined "that it would be more likely than not that a practicing traffic engineer would recommend signalization at this location." Nonetheless, he also testified that it would be reasonable for other engineers to conclude that a traffic signal is not justified at the Intersection, that other practicing engineers might disagree with his opinion, and that such disagreement would be reasonable. Mr. Tramel admitted that the installation of a signal was not mandated by the MUTCD. Furthermore, he did not opine that the lack of a three-phase signal at the Intersection created an unreasonable risk of harm to the motoring public or that the absence of a three-phase light at the Intersection contributed to the accident.

Compliance with the MUTCD constitutes prima facie evidence of no fault by DOTD for failing to install proper signalization. La.R.S. 32:235(E). *Renfro v. Burlington N. Santa Fe Ry. Co.*, 15-372 (La.App. 3 Cir. 5/11/16), 193 So.3d 1192. This presumption is rebuttable and does not preclude a finding, based on other evidence, that the highway actually was unreasonably dangerous and that DOTD was negligent. *Id.*

---

[4] A warrant is a factor that must be considered in determining whether a three-phase signal is required. One or more warrants must be met before a traffic signal can be installed.

DOTD hired a traffic engineer, Joseph D. Blaschke, to review Mr. Tramel's conclusions and AGLIC's claim that the lack of a three-phase signal at the Intersection constituted an unreasonable risk of harm. In addition to reviewing Mr. Tramel's traffic study, Mr. Blaschke reviewed evidence of how the accident occurred and opined that the accident was caused by Mr. Pitre's entering the Intersection as Mr. Stutes approached it and that the traffic study of the Intersection conducted by Mr. Tramel did not justify a three-phase signal.

AGLIC's argument that because Mr. Pitre stopped at the stop sign/flashing signal, he would have obeyed three-phase signal and entered the Intersection only when he had a green light has been rejected under similar facts by courts that determined "there is no negligence on the part of DOTD when an accident is caused by the fault of a motorist failing to obey the existing signage and arguing that had a different warning been given it would have been obeyed." *Stewart v. State ex rel. Dep't of Transp. & Dev.*, 08-772, p. 9 (La.App. 1 Cir. 3/20/09), 9 So.3d 957, 964, *writs denied*, 09-1228 (La. 9/18/09), 17 So.2d 968. *See also Jacques v. State Through Dep't of Transp. & Dev.*, 03-2226 (La.App. 1 Cir. 9/17/04), 905 So.2d 294, *writ denied*, 04-3013 (La. 2/18/05), 896 So.2d 36; *Holt v. State Through Dep't of Transp. & Dev.*, 28,183 (La.App. 2 Cir. 4/3/96), 671 So.2d 1164, 1171, *writs denied*, 96-1074 (La. 6/21/96), 675 So.2d 1093; 96-1132 (La. 6/21/96), 675 So.2d 1080; and *Burge v. City of Hammond*, 509 So.2d 151 (La.App. 1 Cir.1987).

Mr. Pitre stopped at the Intersection but then proceeded into it knowing that he could only see traffic within the Intersection and drove directly into the path of Mr. Stutes' truck. Mr. Pitre's entering the Intersection without being able to see approaching traffic was in direct contravention of La.R.S. 32:234(B) which has been held to constitute gross negligence. *See Holt*, 671 So.2d 1164. By entering

10

the Intersection without being able to see approaching traffic he also failed to exercise the "unusual caution" required by the foggy conditions, *Charan*, 965 So.2d at 474, and violated the "high standard of care" he owed the motoring public. *Davis v. Witt*, 02-3102, 02-3110, p. 13 (La. 7/2/03), 851 So.2d 1119, 1129.

Based on the evidence before us, Mr. Pitre's entering the Intersection as Mr. Stutes approached constitutes gross negligence and was the sole cause of the accident. Accordingly, no genuine issue of material fact has been shown to exist with regard to whether DOTD had a duty to install a three-phase signal at the Intersection, and we affirm the trial court's grant of summary judgment in favor of DOTD and the Stuteses.

### *Life Expectancy*

AGLIC next asserts that the trial court erred in permitting the jury to consider a life care plan based on the life expectancy of a person without a serious spinal cord injury such as Mr. Stutes and then denying its request for a reduction in the jury's award for Mr. Stutes' future medical expenses. It argues that because of the nature and severity of Mr. Stutes' injuries, the trial court erred in allowing the jury to consider the testimony of Mr. Stutes' physicians that he could live until 81.5 years of age, a "normal" lifespan. Dr. Cornelius Gorman, a vocational rehabilitation expert and life care planner, and Dr. Shelly Savant, a neurologist, psychologist, and life care planner, prepared a life care plan to establish the estimated cost of all the medical treatment his physicians expected him to need during the remainder of his lifetime. The life care plan was prepared in consultation with Mr. Stutes' treating physicians. Drs. Gorman and Savant confirmed that when preparing their life care plan for Mr. Stutes, they calculated his future life expectancy based on the general Life Expectancy Table published by the U.S. Department of Health and Human Services. They testified that the quality

11

of care provided to a person with a spinal injury is directly related to his longevity. Their testimony was corroborated by Mr. Stutes' current treating physicians, who testified that they treated patients with spinal cord injuries such as Mr. Stutes who lived into their eighties. Based on this information, Mr. Stutes' expert economist calculated the value of the Gorman/Savant life care plan based on the estimated 21.5-year general life expectancy table. He also calculated the value of an 18.25-year life care plan. The jury awarded the cost of the 18.25-year life care plan.

The jury also considered the testimony of the defendants' life care plan experts, Dr. Susan J. Garrison and Ginny Stegent, R.N., which reflected a reduced life expectancy of fifteen years. The Garrison/Stegent Plan utilized a life expectancy table prepared by the National Spinal Cord Injury Statistical Center at the University of Alabama at Birmingham (NSCISC). This "table estimates life expectancy for persons with spinal cord injuries who survive at least one year post-injury by current age and neurologic category." *Duncan v. Kansas City So. Ry.Co.*, 00-66, p. 21 (La. 10/30/00), 773 So.2d 670, 687.

AGLIC argues that in *Duncan*, 773 So.2d 670, the supreme court prohibited the use of a normal life expectancy table for all persons with spinal cord injuries; therefore, the trial court committed manifest error in allowing the Gorman/Savant life care plan to be presented to the jury. AGLIC made this argument to the trial court in a motion in limine which the trial court denied. It then filed writ applications with this court and the supreme court, seeking review of the trial court's denial of its motion in limine. The requested relief was denied by this court, *Stutes v. Greenwood Motor Lines, Inc.* 16-854 (10/24/16), and the supreme court. *Stutes v. Greenwood Motor Lines, Inc.*, 16-1934 (10/26/16).

Citing *Duncan*, 773 So.2d 670, AGLIC contends that the jury should only have been allowed to consider evidence that Mr. Stutes' remaining life expectancy

at the time of trial was fifteen years, as per the NSCISC life expectancy table and testified to by Dr. Stengent. In *Duncan*, the jury accepted the plaintiff's expert testimony that that the 15-year-old plaintiff, who had suffered a spinal injury at C5, had a normal life expectancy of eighty-one years. The supreme court held that the trial court's acceptance of the plaintiff's expert's testimony constituted manifest error because it failed to account for the effect of her injuries on her life expectancy.

Contrary to AGLIC's argument, the supreme court did not hold that the life expectancy stated in the NSCISC table represented the plaintiff's maximum life expectancy. Instead, the supreme court observed that the NSCISC table's life expectancy for the plaintiff was 42.6 years but then accepted the defendant expert's opinion of a 57-year life expectancy as being more "accurate" than the 81-year life expectancy predicted by the plaintiff's expert. Moreover, AGLIC's argument fails to acknowledge Dr. Savant's testimony regarding the latest version of the NSCISC Life Expectancy Tables which states that the tables are "rough estimates for life expectancy" and specifically recognizes that "access to care" is a prognostic factor to be considered when estimating life expectancy.

Our review of the record shows that the jury approached this issue in the same manner the supreme court approached it in *Duncan*, 773 So.2d 670. That is, the jury considered the defendant experts' opinion that Mr. Stutes' life expectancy is fifteen years, as per the NSCISC life expectancy table, and weighed it against the testimony of Dr. Savant and Mr. Stutes' treating physicians that in their experience, a patient with a spinal cord injury who follows his physicians' treatment recommendations and receives the level of care Mr. Stutes has received can have a normal life expectancy. The jury then concluded that although Mr. Stutes' life expectancy will likely be extended beyond the age stated in the

13

NSCISC table, his life expectancy will most likely be reduced to some extent as a result of his injuries.

Based on the evidence before us, we find no error with the trial court's decision to allow evidence of the "normal" life expectancy table along with the NSCISC table for patients with spinal cord injuries. The jury's conclusion that Mr. Stutes' life expectancy ranged between the ages opined by the experts is supported by the evidence. Accordingly, we find no manifest error with the jury's award of $7,500,000 for future medical and life care expenses. The award reflects the jury's reduced life expectancy of 18.25 years for Mr. Stutes which is supported by the evidence.

### *General Damages*

Lastly, AGLIC argues that the jury's general damage awards are excessive. The jury awarded Mr. Stutes the following general damages:

| | |
|---|---|
| Physical pain and suffering (past, present, future) | $ 4,000,000 |
| Mental pain and suffering (past,present,future) | $ 5,000,000 |
| Diminished life expectancy | $ 1,750,000 |
| Loss of enjoyment of life | $ 6,000,000 |
| Permanent disability | $ 4,000,000 |

Louisiana jurisprudence has long held that the trier-of-fact has great discretion when assessing damages; therefore, general damage awards are reviewed under the abuse of discretion standard. *Guillory v. Lee*, 09-75 (La. 6/26/09), 16 So.3d 1104. This standard of review is both hard to articulate and "necessarily non-specific." *Cone v. Nat'l Emergency Servs., Inc.*, 99-934, p. 8 (La. 10/29/99), 747 So.2d 1085, 1089 (quoting *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993)). In *Youn*, 623 So.2d at 1261, the supreme court acknowledged that reasonable persons often cannot agree on an appropriate award

for general damages and held that appellate courts should disturb an award of general damages only when "the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." Appellate courts only examine prior awards to determine whether a judgment is abusively low or excessively high after it has determined that an abuse of discretion has occurred. *Cone*, 747 So.2d 1085.

The difficulty of the jury's task in awarding Mr. Stutes general damages and our task in reviewing those awards was addressed by this court in *McMullen v. Pan American Fire & Casualty Co.*, 352 So.2d 1058, 1060 (La.App. 3 Cir. 1977), *writs denied*, 354 So.2d 209 (La.1978):

> The pain and suffering, disfigurement and disability have been well proven in this case by both expert and lay witnesses. To listen to the testimony given by these witnesses in relation to the injuries suffered, as well as seeing this man in person at the trial and the picture taken after the accident, one must come to the conclusion that there is just no proper dollar amount which could possibly indemnify anyone for such injuries. However, this Court must nevertheless try.

The evidence at trial showed that Mr. Stutes' life was completely transformed in the early morning hours of January 23, 2013. In a matter of minutes, he went from a hard-working man who was most satisfied by helping others to a man who must rely on others to tend to his every need. Mr. Stutes had been married to his wife, Carroll, for many years when the accident occurred. They had a close, loving relationship and enjoyed many activities together. Carroll had suffered a stroke approximately two and one-half years before the accident and lived in a nursing home. Mr. Stutes visited her daily, going directly to the nursing home after work every weekday. He participated in social activities at the nursing home with Carroll and the other residents and often performed tasks around the nursing home.

15

Immediately after the accident, Mr. Stutes learned that his spinal cord was injured at T4 level and that he was paralyzed from his chest down. Among Mr. Stutes' numerous injuries, an injury to his right shoulder was one of his worst. His daughter Ashley testified that when looking at him, the only area not injured was his head. Medical testimony established, however, that he did have lacerations on his head, a concussion, and brain injury. Due to the extent and severity of his injuries, Mr. Stutes was transferred from Lafayette to New Orleans to a rehabilitation facility. He did not return home until approximately six months after the accident.

As a result of his right shoulder injuries, there is a great deal of calcification in his right shoulder that prevents Mr. Stutes from being able to fully extend his right arm and rotate his shoulder, which has resulted in the use of his right arm being greatly limited. He cannot use his right arm to assist in transferring himself from one surface to another, such as his wheelchair to his bed. Mr. Stutes attempted to transfer himself on one occasion when Ashley was present. His right arm could not support him, and he fell. He also had injuries to his left arm that have caused limitations. As a result, his treating physicians testified that Mr. Stutes is a "functional" quadriplegic.

Mr. Stutes must have assistance twenty-four hours a day. He requires a catheter to void urine which has painful complications. He also suffers daily the humiliation of having no privacy as his caretakers tend to his bodily functions to insure that they are properly maintained. He cannot dress or feed himself. The daily ritual of bathing, dressing, feeding, and otherwise preparing him for the day requires three to four hours. He can only be left alone for very short periods of time because he cannot move himself in the event of an emergency.

Mr. Stutes enjoyed hunting, fishing, gardening, and woodworking as hobbies, but he had stopped participating in those hobbies when Carroll was moved to the nursing home. He testified that he attempted to do some gardening in box planters after his wife died but quit because his bladder drain would get kinked. He also testified that although he has no feeling from his chest down, his shoulders, especially his right shoulder, are a great source of pain for him. He further testified that he wakes every morning aching from his chest up and explained that he refuses to take prescription pain medication because they put him in a bad mood and make him drowsy. With regard to his right shoulder, Mr. Stutes testified that he has good days and bad days and that on bad days he stays in bed all day. Changes in the weather often cause an increase in his pain. He explained that cold weather is very hard on him because he has "so much metal in me" that his shoulders are never warm.

Mr. Stutes testified that he was excited because Ashley was pregnant, but expressed sadness that he would not be able to play with the baby on the floor. He described for the jury the effect the accident has had on him emotionally. His simple, direct testimony reveals the range of emotions he must deal with regularly—despair, depression, optimism, and thankfulness, as a result of his injuries:

> Every day I wake up[,] and I thank God because I can see sunlight. God kept me alive for a reason. And what I have left I'm trying to do the best with what I have. Because some days I don't want to live. It's very hard to live the rest of your life in a chair or in the bed. And I can't do the simplest things as change a light bulb. And it's very hard to watch somebody else do something for you when you're used to helping everybody else. It's very tough to deal with. So, I try to do the best with what I have left. My main concern is helping other people[,] and I can't no more. And that hurts. But there's always somebody worse than me.

Mr. Stutes' treating physicians; Michael Norman, his primary certified nursing assistant who cares for him during the day; and Ashley further described his physical and mental suffering, the serious pain he has endured, and his struggles to adapt to his new life. His physicians outlined his extensive injuries, how they have affected him from a professional standpoint, and the limitations he now has. They also detailed the personal attention and medical care that he requires, including preventive care that is required as a result of his spinal cord injury. They explained that due to his paralysis, Mr. Stutes is prone to develop bed sores, urinary tract infections, pneumonia, and continued calcification and arthritis in his right shoulder, all of which will require medical treatment and possibly hospitalizations. His physicians further testified that Mr. Stutes complies with their treatment recommendations as best he can.

Mr. Norman gave further insight into the impact that Mr. Stutes' injuries have had on his ability to socialize. He explained that Mr. Stutes likes to go on outings but his outings are limited by accessibility for his wheelchair and that on most outings, Mr. Stutes remains in his van. He further explained that on those occasions that Mr. Stutes gets out of the van, he worries about inconveniencing others with his wheelchair. Mr. Norman related that on one trip, he brought Mr. Stutes to visit a location where he had planned to retire, explaining that Mr. Stutes got emotional when they reached their destination because he knew he could not retire there as he had previously planned.

Ashley described how the accident affected her father, explaining that he is often depressed because he is not the man he once was. She explained that he was upset that people now opened doors for him, whereas before he was injured, he opened doors for others. She testified that he was upset after seeing accident photographs at trial that he had not seen before. Ashley told the jury how excited

18

her father was that she was pregnant and expecting a little girl. She then related that she had asked him to build a crib for the baby, but he began crying and told her that he could not because his right arm injury will not allow him to use his power tools. Ashley also testified that her father had fallen twice. On the first occasion, she called a local police officer, a personal friend, who brought along his brother and two friends to be able to move him safely. On the second occasion, she called a firefighter friend who brought four others to move him. Ashley and her husband live with Mr. Stutes, so she can care for him when a CNA is not with him.

The jury heard and considered the extensive evidence of Mr. Stutes' injuries and the impact, physically and mentally, those injuries have had on him and will continue to have on him. Based on the record before us, we cannot say that the jury's damage awards are an abuse of the much discretion afforded them and affirm them all.

## DISPOSITION

Having considered American Guaranty and Liability Insurance Company's assignments of error and finding no error with the trial court's grants of summary judgment in favor of the Department of Transportation and Development and the Stuteses, with the trial court's decision to allow into evidence the Department of Health and Human Services Life Expectancy Table, or with the jury's general damage awards, we affirm the judgment of the trial court. All costs are assessed to American Guaranty and Liability Insurance Company.

**AFFIRMED.**

**Conery, J., concurs in the result and assigns reasons.**

I concur with the result of the majority's opinion. The main issue with which I have concern is the amount of the general damage award, which I feel was extremely high. The total general damage award in this case, $21,750,000.00, far exceeds the average past awards for injuries of this type. As noted by AGLIC's counsel in its brief and reply brief, the vast majority of general damage awards cited for similar injuries range between 2.5 million and 9 million dollars.

The jury verdict form contains separate line items of general damages that arguably allow for a duplication of awards for specific items that juries may find difficult to differentiate. For example, the jury returned a verdict for general damages on a special verdict form as follows:

| | |
|---|---|
| Physical pain and suffering (past, present, future) | $4,000,000 |
| Mental pain and suffering (past, present, future) | $5,000,000 |
| Diminished life expectancy | $1,750,000 |
| Loss of enjoyment of life | $6,000,000 |
| Permanent disability | $4,000,000 |

In addition, approximately 9 million was awarded in special damages for a total judgment of $30,438,225.00.

I am of the view that the itemization of general damage categories on the verdict form added substantially to the likelihood that the jury would award separate general damages for, essentially, the same injury, and, in my view, contributed to the high verdict. However, since there was no objection to the jury verdict form, a finding of manifest error cannot be supported on that basis. *Royer v. State Dep't of Transp. & Dev.*, 16-534 (La. App. 3 Cir. 1/11/17), 210 So.3d 910, 923, *writ denied*, 17-288 (La. 4/24/17), 221 So.3d 69; *Kennedy v. Davis*, 17-218 (La. App. 3 Cir 10/4/17), ____So.3d____.

Plaintiff's closing argument also contains a strong "send a message/retribution statement" that should properly be directed only at punitive damages, not applicable in this case. *See Gillespie v. Calcasieu Parish School Bd.*, 15-647 (La.App. 3 Cir. 12/2/15), 179 So.3d 966, 970. Likewise, there was no objection to plaintiff's counsel's "send a message" plea to the jury.

I agree that Mr. Stutes had extremely serious and debilitating injuries and is entitled to fair and just compensation. I question whether the total general damage award is also **reasonable**. However, based on the manifest error rule and our limited appellate role in reviewing a jury's verdict, I cannot say that there is no "reasonable basis" for the general damage awards in the record, especially after a review of the "day in the life video" shown to the jury, again without objection. Therefore, I respectfully concur in the result.